IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| G.S., by and through his parents,<br>F.S. and J.S., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ROSE TREE MEDIA SCHOOL DISTRICT, | : |
| | : |
| JAMES WIGO, in his individual capacity | : |
| | : |
| ELEANOR DIMARINO-LINNEN, in her<br>individual capacity, | : |
| | : |
| RALPH HARRISON, in his individual capacity, | : |
| | : |
| ROBERT SALLADINO, in his individual<br>Capacity, and | : |
| | : |
| KIRSTEN WHITE, in her individual capacity, | : |
| | : |
| Defendants. | : |

Civil Action No. 18 - 4104

FILED
SEP 24 2018
KATE BARKMAN, Clerk
By _____ Dep. Clerk

## COMPLAINT

1.     While the history of this case is long, it is straightforward.  From the time that Plaintiff, a homeless child, was a middle school student, Defendants have abused their power and positions to achieve their goal of kicking him out of their schools.

2.     This civil action arises under 42 U.S.C §§ 1983 and 1988, as well as Pennsylvania law, seeking compensatory damages, punitive damages, declaratory relief, and injunctive relief against Defendants for, among other things, depriving Plaintiff of his rights to freedom of speech

SEP 24 2018

and due process under the United States and Pennsylvania constitutions, retaliating against Plaintiff for his assertion of his federal civil rights, and defaming Plaintiff's character.

3.      The declaratory relief, injunctive relief, and damages sought are authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, 42 U.S.C. § 1988, and Rule 57 of the Federal Rules of Civil Procedure, as well as Pennsylvania jurisprudence.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331.  This case arises under the First and Fourteenth Amendments of the United States Constitution, as made applicable to the states by the Fourteenth Amendment, and the laws of the United States, specifically, 42 U.S.C. §§1983 and 1988, as amended.

5.      This Court has supplemental jurisdiction over the Pennsylvania law claims in this case pursuant to 28 U.S.C. § 1367 because those claims are so related to the claims that are within this Court's original jurisdiction that they form part of the same case or controversy.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  All of the actions complained of herein occurred within the Eastern District of Pennsylvania.

## PARTIES

7.      Plaintiff G.S. is a 17-year-old student at Penncrest High School, which is located in Media, PA, and is part of the Rose Tree Media School District.  G.S. lives with his parents in Brookhaven, PA.

8.      Plaintiff's parents bring this action on his behalf.

9.      Defendant Rose Tree Media School District ("District") is a political subdivision of the Commonwealth of Pennsylvania.  Its administrative offices are located at 308 North Olive

Street in Media, PA 19063.  As a local municipal government body, the District is a "person"

subject to suit within the meaning of 42 U.S.C. § 1983.

10.     Defendant James Wigo ("Mr. Wigo") is, and at all relevant times was, the

Superintendent of the District.  At all relevant times, Mr. Wigo was, by virtue of his status as an

employee of the district, acting under color of state law.  Plaintiff sues him in his individual

capacity.

11.     Defendant Dr. Eleanor Dimarino-Linnen ("Dr. DiMarino-Linnen") is the Acting

Superintendent of the District and at all relevant times was the District's Director of Pupil

Services.  At all relevant times, Dr. DiMarino-Linned was, by virtue of her status as an employee

of the district, acting under color of state law.  Plaintiff sues her in her individual capacity.

12.     Defendant Ralph Harrison ("Mr. Harrison") is, and at all relevant times was, the

Principal of Penncrest High School.  At all relevant times, Mr. Harrison was, by virtue of his

status as an employee of the district, acting under color of state law.  Plaintiff sues him in his

individual capacity.

13.     Defendant Dr. Robert Salladino ("Dr. Salladino") is, and at all relevant times was,

the Principal of Springton Lake Middle School.  At all relevant times, Dr. Salladino was, by

virtue of his status as an employee of the district, acting under color of state law.  Plaintiff sues

him in his individual capacity.

14.     Defendant Kirstin White ("Ms. White") was, at all relevant times, the Assistant

Principal of Springton Lake Middle School.  At all relevant times, Ms. White was, by virtue of

her status as an employee of the District, acting under color of state law.  Plaintiff sues her in her

individual capacity.

# FACTS

## I.    Introduction

15.    G.S. is a kind, respectful child who, along with the rest of his immediate family, became homeless when his father lost his job through no fault of his own.  The District recently expelled G.S. via a letter dated 24 August 2018, purportedly because G.S., on the morning of 1 April 2018, posted to his Snapchat account—which is followed by approximately 65 people, only about four of whom are students in the Rose Tree Media School District, and on which he posts little other than snippets of song lyrics—a snippet of lyrics from the song *Snap* by the band Spite.

16.    G.S. did so outside of school hours, off of school grounds, and using no District instrumentalities.

17.    He did not direct the lyrics of *Snap* towards the District, its students, or its agents in any way.

18.    Someone else then took G.S.'s post, removed it from the context of his song lyrics-focused Snapchat account, and began disseminating it on other forms of social media, including, but not limited to, Instagram and Facebook.

19.    Yet another person then took G.S.'s post and transformed it into a direct threat against the District by adding the words, "@penncrest_students."  That translates from Internet vernacular to "at Penncrest students."

20.    As set forth below, the District accused G.S. of terroristic threats, harassment, and disrupting the school environment.  It did so despite the facts that (1) it made no inquiry whatsoever into G.S.'s state of mind, even though all three of those offenses have a state of mind component; (2) it sought to punish G.S., in part, under a policy regarding the interpretation of

student speech that was never promulgated until *after* G.S.'s Snapchat post; and the District's

own mal- and non-feasance, including, but not limited to, prior defamation of G.S., and not any

conduct by G.S., was responsible for the disruption of the school environment.

21.     The District's efforts to expel G.S. were not only baseless and outside the

District's authority, but taken to retaliate against G.S. and his family for their successful

assertion of their federal civil rights under the McKinney-Vento Act.

## II.     Defamation of G.S.

22.     G.S. and his family have, for years now, endured something akin to persecution

by the District.  In the Fall of 2014, the Family lost their home due to financial hardship.  They

moved in with G.S.'s maternal grandmother in Brookhaven.

23.     There they remain, doubled up with ten people in a single-family residence.  The

family have no personal space to themselves and no room for their personal belongings.  They

sleep primarily in the living room.  G.S. occasionally sleeps in an unfinished basement that has

no heat, no air conditioning, and is frequently invaded by vermin.

24.     The District, at that time, properly deemed the Family's living circumstances to

qualify as homelessness under the McKinney-Vento Act.  It accordingly found that G.S. and his

sister were entitled to remain enrolled in the District's schools under the McKinney-Vento Act.

25.     But then, in January 2015, the District, by and through Ms. White, Dr. Salladino,

Dr. DiMarino-Linnen, and Mr. Wigo, falsely accused G.S. of making a school shooting threat.

G.S. was, in fact, talking about a new paint ball gun he had received for Christmas.

26.     The District, by and through Ms. White, Dr. Salladino, Dr. DiMarino-Linnen, and

Mr. Wigo, continued to make the false claim that G.S. was a putative mass school shooter even

after it received evidence demonstrating that the students who had accused G.S. of making such threats had lied to get G.S. in trouble.

27. The District, Ms. White, Dr. Salladino, Dr. DiMarino-Linnen, Mr. Harrison, and Mr. Wigo have continued from January 2015 to the present to defame G.S. by maintaining its false accusation that he had threatened a school shooting. Defendants even repeated that knowingly false accusation during the expulsion proceedings in this matter and expressly relied on its false claim that G.S. made such a threat in January 2015 when the District decided to pursue G.S.'s expulsion in the matter at bar.

28. During the 2015-2016 school year, G.S. attended a private school pursuant to a settlement agreement between the parties ("the Agreement"). The purpose of that Agreement was primarily to resolve the Parties' dispute regarding the District's first attempt to kick G.S., a homeless child, out of their schools.

**III.    G.S.'s Assertion of his Rights under the McKinney-Vento Act**

29. When Parents attempted to re-enroll G.S. in the District for the 2017-2018 school year, however, the District refused to do so based on the Proxy Waiver. The District's McKinney-Vento Coordinator, Dr. Eleanor DiMarino-Linnen, further refused to initiate a Level I grievance concerning G.S.'s enrollment pursuant to the McKinney-Vento Act and Pennsylvania's State Plan on the education of homeless youth.

30. Parents accordingly initiated a Level II grievance with Shane Burroughs, the regional coordinator for McKinney-Vento matters for the Region 8, which includes the District. On or about 1 September 2016, Mr. Burroughs determined on behalf of PDE that the District must enroll G.S. under the McKinney-Vento Act. The District refused to do so.

31.     On 6 September 2016, Parents filed a lawsuit before the Eastern District of Pennsylvania, seeking G.S.'s enrollment in the District pursuant to the McKinney-Vento Act. Parents simultaneously sought a preliminary injunction for G.S.'s immediate re-enrollment pending the resolution of the parties' dispute regarding G.S.'s enrollment as a homeless child. The District, based on little in the way of case law and with heavy emphasis on the defamatory accusation that G.S. had made a school shooting threat, opposed.

32.     It lost.  In September 2016, the Eastern District of Pennsylvania granted G.S. a preliminary injunction requiring the District to enroll G.S. and return him to his last educational placement while in the District prior to the Agreement, which was homebound education.

33.     In January 2017, G.S. went to a 60-day diagnostic placement at LifeWorks.  Upon completion of that diagnostic placement, G.S. was determined to not be a danger to himself or to others, and further to no longer be in need of special educational programming.  But the District, in plain violation of the Eastern District of Pennsylvania's preliminary injunction, refused to return G.S. to Penncrest.  The Court ordered the District to do so on 19 May 2017.  G.S. finished out his sophomore year at Penncrest successfully.

34.     Then, on 31 July 2017, the Eastern District of Pennsylvania granted G.S. a permanent injunction requiring his enrollment at Penncrest for the duration of his homelessness. In reaching its decision, the District Court described the District's efforts to escape its obligations under the McKinney-Vento Act, as, among other things, self-defeating, unsupported by applicable case law, and "strange, at best."

35.     The District nonetheless appealed to the Third Circuit Court of Appeals.  The Third Circuit held oral argument in the matter on 4 June 2018.  While the Third Circuit has yet to issue an opinion in the District's appeal of its loss before the District Court, at the oral argument

in the matter, counsel admitted on behalf of the District the District simply "doesn't want [G.S.] there because of his behaviors." *See* http://www2.ca3.uscourts.gov/oralargument/audio/17-2886GSetalvRoseTreeMediaSchoolDistrict.mp3 at 40:03-41:08.

36.     This admission by the District through counsel not only repeats the District's defamation against G.S. from January 2015, it indicates that Defendants have persistently sought to kick G.S. out of their schools through legal and extralegal means.

**IV.     Defendants' Violations of the First and Fourteenth Amendments**

37.     On the morning of Sunday, 1 April 2018, G.S. posted the chorus of the song *Snap*, by the band Spite, to his Snapchat account from his personal phone.

38.     G.S. has approximately 65 Snapchat followers. Of those, approximately four are students within the District. All of his followers are familiar with the fact that G.S. uses his Snapchat account primarily to post lyrics from songs.

39.     The lyrics of *Spite* say, among other things, that the lyricist will kill "everyone." It is not directed against a particular person or group, and G.S. did not alter the text or punctuation in any way to direct it at Rose Tree Media School District, its agents, or its students. No one outside of G.S.'s 65 followers had access to his Snapchat postings.

40.     At some point after G.S.'s post, however, one or more of his 65 followers reposted his snippet from *Snap* on other, more public media, including Instagram and Facebook. Those who did so did not place the post in context as song lyrics from a Snapchat feed that frequently features song lyrics.

41.     In addition, another person altered the post to indicate that it was directed at Penncrest students. That doctored post, too, began to make the rounds on social media. By mid-

day on 1 April 2018, parents who had seen G.S.'s post out of context had notified Mr. Harrison, Mr. Wigo, and the Pennsylvania State Police of a potential threat by G.S.

42.     On 1 April 2018, the Pennsylvania State Police reached out to the Family and the Family appeared voluntarily for an interview. G.S. informed Trooper McMillan that the Snapchat post was his and was a snippet of the song *Snap* by Spite, which he had posted because he really likes the music.

43.     According to Trooper McMillan, the District knew no later than 11:00 pm on 1 April 2018 that G.S. was in custody and would remain in custody and would not be in school.

44.     The District was capable of informing its community that G.S. was in custody prior to the start of the 2 April 2018 school day.

45.     The District chose *not* to inform its community of parents that G.S., whom it had falsely characterized as a danger to the community *for over three years*, was in custody and could not pose a danger to its students until 9:35 a.m. on 2 April 2018, *after* parents had to make the decision of whether to send their children to school.

46.     School was open on 2 April 2018 and classes proceeded as scheduled.

47.     The District suspended G.S. for ten days for posting song lyrics to his song lyrics-focused Snapchat account. The suspension was made pursuant to a practice under which the District treats "[e]very threat as credible," which was first promulgated to the RTMSD community in writing on 2 April 2018 at 6:00 p.m. and had never before been included in any District statement of policies or procedures.  Defendants Wigo and Harrison admitted that this practice was an "unwritten rule" prior to 2 April 2018, and that District personnel were trained and instructed to follow it.

48.     The District involved Dr. DiMarino-Linnen in discussions regarding G.S.'s discipline not because she is involved in student discipline, but because of his litigation against the District under the McKinney-Vento Act. On information and belief, Dr. DiMarino-Linnen advised Mr. Harrison and Mr. Wigo to seek G.S.'s expulsion based on (1) the false defamatory claim that G.S. had previously made a school shooting threat; (2) Defendants' shared, stated desire to kick G.S. out of their schools by any lawful means; and (3) because G.S. had successfully asserted his rights under the McKinney-Vento Act.

49.     At the time of the incident, the District did not have a policy on Terroristic Threats, and so in this case borrowed the definition of Terroristic Threats under Pennsylvania law—which requires proof of *mens rea*.

50.     The District *did* have a policy on Harassment, which required proof of a "repeated pattern of unprovoked aggressive behaviors of a physical and/or psychological nature," which is "sufficiently severe, persistent, or pervasive" that it "creates an intimidating, threatening, or abusive educational environment, which "[h]as the purpose or effect of substantially or unreasonably interfering with an individual's academic performance, and which "[o]therwise adversely affects an individual's learning opportunities," *see* RTMSD Board Policy 248;

51.     As Messrs. Wigo and Harrison admitted, the District made no inquiry into G.S.'s state of mind, and produced no evidence contradicting the conclusions of his court-ordered evaluators that G.S. had no intent to make a threat against anyone.

52.     The District nonetheless initiated expulsion proceedings against G.S. Defendants produced no evidence that G.S. engaged in a repeated pattern of unprovoked, aggressive behaviors, or that G.S.—rather than those who reposted his speech widely and out of context, or altered it into a statement targeted at District students—created an intimidating, threatening or

abusive educational environment that adversely affected an individual's academic performance or learning opportunities;

53.     The District based its determination of whether a terroristic threat and harassment occurred *exclusively* on the reaction in the community, rather than G.S.'s state of mind.

54.     The District does not have a policy on disruption of the school environment, but its Disciplinary Responses to Student Misconduct describe that offense as a Level II offense that does not warrant expulsion.

55.     Despite claiming to treat "every threat as credible," the District refused to do any investigation whatsoever of the doctoring of G.S.'s Snapchat post to make it into something directed at Penncrest students.

56.     The District involved Dr. DiMarino-Linnen in the discussions regarding G.S.'s recommended punishment because he is involved in his McKinney-Vento litigation with the District.  On information and belief, she repeated the false and defamatory claim that G.S. was a putative school shooter and recommended his expulsion.

57.     Apart from the charges at bar, G.S. has had no disciplinary incidents in the District since his return to Penncrest in May 2017.

58.     Throughout the expulsion process, the District relied on incomplete or inaccurate information. This was evidenced by the inconsistent testimony provided by District employees during the expulsion hearing. Pertinently, although the District has no reason to doubt Trooper McMillan's testimony, it represents that it learned that G.S. was in custody on the night of 1 April 2018, or maybe first thing in the morning on 2 April 2018, or maybe later in the morning on 2 April 2018 through idle conversation with Pennsylvania State Troopers who were on the grounds in part because of an alleged threat by another student.

59.     Following the expulsion proceedings against G.S., the District, (1) despite its failure to adduce sufficient evidence of the charges against him; (2) pursuant to an unwritten policy that was never promulgated until after G.S.'s Snapchat post; (3) in retaliation for G.S.'s assertion of his civil rights under the McKinney-Vento Act; and (4) in reliance on its agents' own false and defamatory claims about G.S., expelled G.S.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATION OF G.S.'s FIRST AMENDMENT RIGHT TO FREE SPEECH
(Against Defendant Rose Tree Media School District)

60.     Plaintiff hereby incorporates each and every allegation in the preceding paragraphs of this Complaint as if set forth fully herein.

61.     Even assuming that the powers according to school districts to regulate on-campus speech apply to off-campus speech (which the Third Circuit has assumed but not held, *see J.S. ex rel. Snyder v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 927 (3d Cir. 2011)), the First Amendment prohibits a public school from punishing a student for off-campus speech that neither causes an actual disruption at school nor could reasonably lead school officials to forecast a substantial disruption to the school environment.

62.     On information and belief, the District maintains a policy, custom, or practice of defining both proximate causation and "substantial disruption to the school environment" (as that term has been defined by clearly-established Supreme Court and Third Circuit case law) much more broadly than is permitted by the First Amendment and binding precedent.  The District thus maintains a policy, custom, or practice of imposing punishments for speech protected by the First Amendment.

63.     Defendant has admitted that it maintains a policy, custom, or practice of treating as threats any student speech regarding violence where that speech can be misapprehended,

regardless of the actual content or context for the student's speech.  Defendant thus maintains a policy, custom, or practice of imposing punishments for speech protected by the First Amendment.

64.    The enforcement of these policies, customs, or practices by Defendants Wigo, DiMarino-Linnen, and Harrison directly caused the deprivation of G.S.'s First Amendment right to free speech when applied to this case.

65.    G.S.'s speech did not cause, and could not reasonably lead Defendants to forecast, a substantial disruption in the District.  G.S. posted song lyrics to a private Snapchat account that was visible to less than 70 individuals.  That post was transmitted and edited by other members of the community.

66.    G.S.'s speech also was not threatening or directed at the District or District officials in any way.  In fact the version of the post which the District viewed, containing the "@penncrest_students" was not posted by G.S.

67.    There was no disruption to the school environment in the District.  Classes and lessons went on as planned.

68.    Even assuming the school environment was disrupted, that disruption was not attributable to G.S.'s speech.  Rather, the disruption to the school environment is solely attributable to Defendants' defamation of G.S., withholding of information from the District's parent community, and fearmongering.

69.    On information and belief, Defendants are aware of the legal standards governing their authority to regulate students' out-of-school speech.  Defendants were thus aware before they punished G.S. that his speech did not meet the thresholds set by the Third Circuit for a district to punish a student for out-of-school speech.

70.     In short, the Defendants suspended G.S. for speech that (1) occurred outside of school; (2) after school hours on a Sunday morning; (3) was not made on a school device; (3) did not disrupt the school environment; and (4) could not have reasonably caused school officials to forecast a substantial disruption or material interference with school activities.  They thus violated his right to free speech under the First Amendment.

71.     Defendants, who were aware of the Third Circuit's clearly-established law about students' protected out-of-school speech, acted maliciously, intentionally, wantonly, or with reckless indifference to G.S.'s First Amendment right to free speech.

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)     Declare unconstitutional the District's policy, custom, or practice of punishing students for out-of-school speech that does not cause or threaten a substantial disruption to the educational environment;

(b)     Declare unconstitutional the District's policy, custom, or practice of treating as threats all student speech regarding violence where that speech can be misapprehended, regardless of content and/or context;

(c)     Order the District to expunge this incident from G.S.'s disciplinary record;

(d)     Award Plaintiff reasonable attorneys fees pursuant to 42 U.S.C. § 1988;and

(e)     Grant such other relief as the Court may deem appropriate.

## COUNT II: VIOLATION OF G.S.'s FIRST AMENDMENT RIGHT TO FREE SPEECH
(Against Defendants Wigo, DiMarino-Linnen, and Harrison)

72.     Plaintiff hereby incorporates each and every allegation in the preceding paragraphs of this Complaint as if set forth fully herein.

73.     Even assuming that the powers according to school districts to regulate on-campus speech apply to off-campus speech (which the Third Circuit has assumed but not held, see *J.S. ex rel. Snyder v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 927 (3d Cir. 2011)), the First

Amendment prohibits a public school from punishing a student for off-campus speech that neither causes an actual disruption at school nor could reasonably lead school officials to forecast a substantial disruption to the school environment.

74.     On information and belief, the District maintains a policy, custom, or practice of defining both proximate causation and "substantial disruption to the school environment" (as that term has been defined by clearly-established Supreme Court and Third Circuit case law) much more broadly than is permitted by the First Amendment and binding precedent.  The District thus maintains a policy, custom, or practice of imposing punishments for speech protected by the First Amendment.

75.     Defendant has admitted that it maintains a policy, custom, or practice of treating as threats any student speech regarding violence where that speech can be misapprehended, regardless of the actual content or context for the student's speech.  Defendant thus maintains a policy, custom, or practice of imposing punishments for speech protected by the First Amendment.

76.     The enforcement of these policies, customs, or practices by Defendants Wigo, DiMarino-Linnen, and Harrison directly caused the deprivation of G.S.'s First Amendment right to free speech when applied to this case.

77.     G.S.'s speech did not cause, and could not reasonably lead Defendants to forecast, a substantial disruption in the District.  G.S. posted song lyrics to a private Snapchat account that was visible to less than 70 individuals.  That post was transmitted and edited by other members of the community.

78.     G.S.'s speech also was not threatening or directed at the District or District officials in any way. In fact the version of the post which the District viewed, containing the "@penncrest_students" was not posted by G.S.

79.     There was no disruption to the school environment in the District. Classes and lessons went on as planned.

80.     Even assuming the school environment was disrupted, that disruption was not attributable to G.S.'s speech. Rather, the disruption to the school environment is solely attributable to Defendants' defamation of G.S., withholding of information from the District's parent community, and fearmongering.

81.     On information and belief, Defendants are aware of the legal standards governing their authority to regulate students' out-of-school speech. Defendants were thus aware before they punished G.S. that his speech did not meet the thresholds set by the Third Circuit for a district to punish a student for out-of-school speech.

82.     In short, the Defendants suspended G.S. for speech that (1) occurred outside of school; (2) after school hours on a Sunday morning; (3) was not made on a school device; (3) did not disrupt the school environment; and (4) could not have reasonably caused school officials to forecast a substantial disruption or material interference with school activities. They thus violated his right to free speech under the First Amendment.

83.     Defendants, who were aware of the Third Circuit's clearly-established law about students' protected out-of-school speech, acted maliciously, intentionally, wantonly, or with reckless indifference to G.S.'s First Amendment right to free speech.

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)    Enjoin Defendants from further treating as threats all student speech regarding violence where that student speech could be misapprehended, regardless of the actual content or context for that speech;

(b)    Award compensatory damages for the emotional distress, mental anguish, and reputational harm G.S. suffered as a result of Defendants' violation of his First Amendment rights in an amount to be proven at trial;

(c)    Award punitive damages against Defendants in an amount sufficient to deter them from pursuing similar unconstitutional disciplinary actions in the future;

(d)    Award Plaintiff reasonable attorneys fees pursuant to 42 U.S.C. § 1988; and

(e)    Grant such other relief as the Court may deem appropriate.

## COUNT III: ENFORCEMENT OF FACIALLY OVERBROAD, VAGUE CONTENT RESTRICTION IN VIOLATION OF FIRST AND FOURTEENTH AMENDMENTS
(Against Defendant Rose Tree Media School District)

84.    Plaintiff hereby incorporates each and every allegation in the paragraphs of this Complaint as if set forth fully herein.

85.    As Defendants Wigo and Harrison expressly stated during their testimony in the expulsion hearing in this matter, Defendant maintains a policy, custom, or practice of treating as threats any student speech regarding violence where that speech can be misapprehended, regardless of the actual content or context for that speech.

86.    Because it applies to all student speech concerning violence, this policy, custom, or practice captures and allows for punishment of a substantial amount of speech protected by the First Amendment.

87.    This policy, custom, or practice was not published or promulgated to the Rose Tree Media School District student population or larger school community until after G.S.'s disciplinary infraction. It was thus impossible to discover the contours of its proscriptions, or to determine whether or when speech may violate it.

88.     Moreover, this previously-unpublished policy, custom, or practice functions as a content restriction that applies indiscriminately to all speech concerning the subject of violence, regardless of whether that speech is properly restricted under the First Amendment.

89.     The District's previously-unpublished policy, custom, or practice thus is facially invalid.  It is overbroad, void for vagueness, and an unconstitutional content restriction.

90.     The enforcement of this policy, custom, or practice by Defendants Rose Tree Media School District, Wigo, DiMarino-Linnen, and Harrison directly cause the deprivation of G.S.'s First and Fourteenth Amendment rights.

91.     Defendant permanently expelled G.S. for his violation of this then-unpublished policy.

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)     Declare unconstitutional the District's policy, custom, or practice of treating as threats all student speech regarding violence where that speech can be misapprehended, regardless of content and/or context;

(b)     Direct Defendant Rose Tree Media School District to revise its policies, customs, and practices to conform them to the requirements of the First Amendment;

(c)     Order Defendant to expunge the discipline from this incident from G.S.'s disciplinary record;

(d)     Order Defendant to permit G.S. to return to the District as a student in good standing;

(e)     Award Plaintiff reasonable attorneys fees pursuant to 42. U.S.C. § 1988; and

(f)     Grant such other relief as the Court may deem appropriate.

**COUNT IV: ENFORCEMENT OF FACIALLY OVERBROAD, VAGUE CONTENT RESTRICTION IN VIOLATION OF FIRST AND FOURTEENTH AMENDMENTS**
(Against Defendants Wigo, DiMarino-Linnen, and Harrison)

92.     Plaintiff hereby incorporates each and every allegation in the paragraphs of this Complaint as if set forth fully herein.

93.     As Defendants Wigo and Harrison expressly stated during their testimony in the expulsion hearing in this matter, Defendant maintains a policy, custom, or practice of treating as threats any student speech regarding violence where that speech can be misapprehended, regardless of the actual content or context for that speech.

94.     Because it applies to all student speech concerning violence, this policy, custom, or practice captures and allows for punishment of a substantial amount of speech protected by the First Amendment.

95.     This policy, custom, or practice was not published or promulgated to the Rose Tree Media School District student population or larger school community until after G.S.'s disciplinary infraction. It was thus impossible to discover the contours of its proscriptions, or to determine whether or when speech may violate it.

96.     Moreover, this previously-unpublished policy, custom, or practice functions as a content restriction that applies indiscriminately to all speech concerning the subject of violence, regardless of whether that speech is properly restricted under the First Amendment.

97.     The District's previously-unpublished policy, custom, or practice thus is facially invalid. It is overbroad, void for vagueness, and an unconstitutional content restriction.

98.     The enforcement of this policy, custom, or practice by Defendants Rose Tree Media School District, Wigo, DiMarino-Linnen, and Harrison directly cause the deprivation of G.S.'s First and Fourteenth Amendment rights.

99.     Defendant permanently expelled G.S. for his violation of this then-unpublished policy.

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)     Enjoin Defendants from further treating as threats all student speech regarding violence where that speech can be misapprehended, regardless of content and/or context;

(b)     Award compensatory damages to G.S. for the emotional distress, mental anguish, and reputational harm he suffered as a result of Defendants' violation of his First and Fourteenth Amendment rights in an amount to be proven at trial;

(c)     Award punitive damages to G.S. against Defendants Wigo, DiMarino-Linnen, and Harrison in an amount sufficient to deter them from pursuing similar unconstitutional disciplinary actions in the future;

(d)     Award Plaintiff reasonable attorneys fees pursuant to 42. U.S.C. § 1988; and

(e)     Grant such other relief as the Court may deem appropriate.

## COUNT V: ENFORCEMENT OF CONTENT RESTRICTION THAT IS OVERBROAD AND VAGUE AS-APPLIED IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS
(Against Defendant Rose Tree Media School District)

100.    Plaintiff hereby incorporates each and every allegation in the paragraphs of this Complaint as if set forth fully herein.

101.    As Defendant Wigo and Harrison testified, Defendant maintains a policy, custom, or practice of treating as threats any student speech regarding violence where that speech can be misapprehended, regardless of the actual content or context for that speech.

102.    Because it applies to all student speech concerning violence, this policy, custom, or practice captures and allows for punishment of a substantial amount of speech protected by the First Amendment.

103.    This policy, custom, or practice was not published or promulgated to the Rose Tree Media School District student population or larger school community until after G.S.'s disciplinary infraction. It was thus impossible to discover the contours of its proscriptions, or to determine whether or when speech may violate it.

20

104.    Moreover, this previously-unpublished policy, custom, or practice functions as a content restriction that applies indiscriminately to all speech concerning the subject of violence, regardless of whether that speech is properly restricted under the First Amendment.

105.    The District's previously-unpublished policy, custom, or practice thus is facially invalid.  It is overbroad, void for vagueness, and an unconstitutional content restriction.

106.    The enforcement of this policy, custom, or practice by Defendants Rose Tree Media School District, Wigo, DiMarino-Linnen, and Harrison directly cause the deprivation of G.S.'s First and Fourteenth Amendment rights.

107.    Defendant permanently expelled G.S. for his violation of this then-unpublished policy.

WHEREFORE, Plaintiff respectfully requests that this Court:

(g)    Declare unconstitutional the District's policy, custom, or practice of treating as threats all student speech regarding violence where that speech can be misapprehended, regardless of content and/or context;

(h)    Direct Defendant Rose Tree Media School District to revise its policies, customs, and practices to conform them to the requirements of the First Amendment;

(i)    Order Defendant to expunge the discipline from this incident from G.S.'s disciplinary record;

(j)    Order Defendant to permit G.S. to return to the District as a student in good standing;

(k)    Award Plaintiff reasonable attorneys fees pursuant to 42. U.S.C. § 1988; and

(l)    Grant such other relief as the Court may deem appropriate.

**COUNT VI: ENFORCEMENT OF CONTENT RESTRICTION THAT IS
OVERBROAD AND VAGUE AS-APPLIED
IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS**
(Against Defendants Wigo, DiMarino-Linnen, and Harrison)

108.     Plaintiff hereby incorporates each and every allegation in the paragraphs of this

Complaint as if set forth fully herein.

109.     As Defendants Wigo and Harrison expressly stated during their testimony in the

expulsion hearing in this matter, Defendant maintains a policy, custom, or practice of treating as

threats any student speech regarding violence where that speech can be misapprehended,

regardless of the actual content or context for that speech.

110.     Because it applies to all student speech concerning violence, this policy, custom,

or practice captures and allows for punishment of a substantial amount of speech protected by

the First Amendment.

111.     This policy, custom, or practice was not published or promulgated to the Rose

Tree Media School District student population or larger school community until after G.S.'s

disciplinary infraction.  It was thus impossible to discover the contours of its proscriptions, or to

determine whether or when speech may violate it.

112.     Moreover, this previously-unpublished policy, custom, or practice functions as a

content restriction that applies indiscriminately to all speech concerning the subject of violence,

regardless of whether that speech is properly restricted under the First Amendment.

113.     The District's previously-unpublished policy, custom, or practice thus is facially

invalid.  It is overbroad, void for vagueness, and an unconstitutional content restriction.

114.     The enforcement of this policy, custom, or practice by Defendants Rose Tree

Media School District, Wigo, DiMarino-Linnen, and Harrison directly cause the deprivation of

G.S.'s First and Fourteenth Amendment rights.

115.    Defendant permanently expelled G.S. for his violation of this then-unpublished policy.

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)    Enjoin Defendants from further treating as threats all student speech regarding violence where that speech can be misapprehended, regardless of content and/or context;

(b)    Award compensatory damages to G.S. for the emotional distress, mental anguish, and reputational harm he suffered as a result of Defendants' violation of his First and Fourteenth Amendment rights in an amount to be proven at trial;

(c)    Award punitive damages to G.S. against Defendants Wigo, DiMarino-Linnen, and Harrison in an amount sufficient to deter them from pursuing similar unconstitutional disciplinary actions in the future;

(d)    Award Plaintiff reasonable attorneys fees pursuant to 42. U.S.C. § 1988; and

(e)    Grant such other relief as the Court may deem appropriate.

### COUNT VII: RETALIATION PURSUANT TO 42 U.S.C. § 1983
(Against Defendants Wigo, DiMarino-Linnen, and Harrison)

116.    Plaintiff hereby incorporates each and every allegation in the paragraphs of this Complaint as if set forth fully herein.

117.    Since January 2015, Defendants have engaged in an ongoing effort to kick G.S. out of their schools.  They redoubled these efforts after Plaintiff asserted his rights under the McKinney-Vento Act and sought his unwarranted expulsion not only in violation of federal and Pennsylvania law, but in retaliation for his assertion of his civil rights under the McKinney-Vento Act.

118.    As a direct and proximate result of the defendants' actions, Plaintiff suffered and continues to suffer emotional injuries, including mental anguish, psychological and emotional distress, anxiety, depression and pain and suffering, some or all of which may be permanent.

119.    Defendants' acts were committed willfully, wantonly, maliciously, intentionally, outrageously, deliberately and/or by conduct so egregious as to shock the conscience.

120.    As a direct and proximate result of the defendants' illegal and unconstitutional actions, plaintiff suffered pain, fear, anxiety, severe emotional trauma and the loss of the enjoyment of life, all to his great detriment and loss.

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)     Award compensatory damages for the emotional distress, mental anguish, and reputational harm G.S. suffered as a result of Defendants' violation of his First Amendment rights in an amount to be proven at trial;

(b)     Award Plaintiff reasonable attorneys fees pursuant to 42 U.S.C. § 1988;

(c)     Award punitive damages sufficient to deter Defendants from pursuing similar unconstitutional disciplinary actions in the future; and

(d)     Grant such other relief as the Court may deem appropriate.

**COUNT VIII: DEPRIVATION OF DUE PROCESS RIGHTS UNDER ARTICLE I, SECTION I OF THE PENNSYLVANIA CONSTITUTION, THE PENNSYLVANIA LOCAL AGENCY LAW, PENNSYLVANIA CODE TITLE 22, CHAPTER 12, AND ROSE TREE MEDIA SCHOOL DISTRICT POLICIES**
(Against Defendant Rose Tree Media School District)

119.    Plaintiff hereby incorporates each and every allegation in the paragraphs of this Complaint as if set forth fully herein.

120.    As Defendants Wigo and Harrison expressly stated during their testimony in the expulsion hearing in this matter, Defendant maintains a policy, custom, or practice of treating as threats any student speech regarding violence where that speech can be misapprehended, regardless of the actual content or context for that speech.

121.    This policy, custom, or practice was not published or promulgated to the Rose Tree Media School District student population or larger school community until after G.S.'s

disciplinary infraction.  It was thus impossible to discover the contours of its proscriptions, or to determine whether or when speech may violate it, at the time G.S. made his Snapchat post.

122.    The District thus placed G.S. in jeopardy of expulsion pursuant to an unwritten rule in violation of his due process rights under the Pennsylvania Constitution, Local Agency Law, and its own policies.

123.    The District, which bore the burden of proving that it was entitled to expel G.S. by a preponderance of the evidence, failed to adduce any evidence regarding G.S.'s state of mind with respect to the disciplinary infractions alleged against him.  The District consequently failed to prove by a preponderance of the evidence that G.S. had committed the infractions of terroristic threats, harassment, and disruption of the school environment.  It nonetheless expelled G.S.

124.    The District's decision to expel G.S. therefore arose from multiple violations of G.R.'s due process rights under the Pennsylvania Constitution, Pennsylvania law, and the due process rights that the District, acting as a local agency, extends to its students and their families.

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)    Issue a declaratory judgment that the District violated the due process rights of G.S. as set forth in this Complaint;

(b)    Grant Plaintiff a permanent injunction directing Defendant Rose Tree Media School District to (1) permit G.S. to re-enroll at Penncrest High School and (2) expunge the expulsion from his disciplinary record; and

(c)    Grant such other relief as the Court deems appropriate.

### COUNT VIII: DEFAMATION OF CHARACTER
(Against Defendants Wigo, DiMarino-Linnen, Harrison, Salladino, and White)

125.    Plaintiff hereby incorporates each and every allegation in the paragraphs of this Complaint as if set forth fully herein.

126.    Plaintiff G.S. is not a public or limited public figure.

25

127.    Beginning in January 2015 continuing to the present, Defendants Wigo, DiMarino-Linnen, Harrison, Salladino, and White have each spread to parents and students in the Rose Tree Media School District, both verbally and in writing, the false claims that in January 2015, Plaintiff G.S. made a threat to commit a mass school shooting and had written a "kill list." They began publishing these false claims on the strength of allegations against G.S. from a few other students.

128.    Defendants Wigo, DiMarino-Linnen, Harrison, Salladino, and White each continued to spread these false claims to parents and students in the Rose Tree Media School District, both verbally and in writing, even after learning that the few students who originally reported such a threat by G.S. had later admitted that their report of a threat was false.

129.    Defendants Wigo, DiMarino-Linnen, Harrison, Salladino, and White also each continued to spread these claims to parents and students in the Rose Tree Media School District, both verbally and in writing, despite knowing that G.S. never made a "kill list."

130.    Defendants Wigo, DiMarino-Linnen, Harrison, Salladino, and White accordingly made their allegations that G.S. was a putative school shooter who had written a "kill list" knowing that those allegations were false.  They were thus at least reckless with regard to the falsity of their statements about G.S.

131.    On information and belief, in spreading these false claims, Defendants identified G.S. either by name or by such level of personal detail that his identity was unmistakable to the community members to whom Defendants communicated the false allegations against him.

132.    Defendants Wigo, DiMarino-Linnen, Harrison, Salladino, and White knew that communicating to the community the false claim that G.S. had made a threat to commit a mass school shooting—which is a crime in Pennsylvania, and, given the recent history of school

shootings in the United States, considered an odious act by the community—would cause people to fear G.S., believe him to be a danger, and shun him.

133. Defendants' at least recklessly false allegations against G.S. accomplished exactly what Defendants knew or should have known they would. As a result of Defendants' false claims, G.S. has been shunned by peers, excluded from activities by adults, and deprived of opportunities for employment and personal advancement in his community. And instead of being known for who he is—a gentle, respectful, and empathetic child—G.S. is instead considered by his community at large to be unstable and dangerous.

134. The harm Defendants caused to G.S's reputation is likely irreparable.

WHEREFORE, Plaintiff respectfully requests that this Court:

(a) Order compensatory damages to Plaintiff against Defendants Wigo, DiMarino-Linnen, Harrison, Salladino, and White jointly and severally in an amount to be established at trial;

(b) Order punitive damages to Plaintiff against Defendants Wigo, DiMarino-Linnen, Harrison, Salladino, and White jointly and severally in an amount sufficient to deter Defendants from defaming the children entrusted to their care again in the future; and

(c) Grant such other relief as the Court deems appropriate.

Dated: 24 September 2018

Respectfully submitted,

Michael D. Raffaele (PA ID 91615)
**Kershenbaum & Raffaele, LLC**
1230 County Line Road
Bryn Mawr, PA 19010
T: (610) 922-4200
F: (610) 646-0888
Michael@MyKidsLawyer.com

*Counsel for Plaintiff*